IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Cause No.:   4:22-cr-40008-JPG |
| ) | |
| JAMOND M. RUSH, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S MOTION TO DISMISS INDICTMENT
& SUGGESTIONS IN SUPPORT OF DISMISSAL**

COMES NOW Defendant Jamond M. Rush, by and through his undersigned counsel, and pursuant to the Second Amendment to the United States Constitution and the recent holding by the United States Supreme Court in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 211 (2022), respectfully moves the Court to dismiss the instant indictment, and in support thereof, states as follows:

The indictment against Mr. Rush charges the defendant with possessing an unregistered, short-barreled rifle in violation of 26 U.S.C. §5861(d), which imposes criminal penalties on anyone who possesses a short-barreled rifle without complying with the National Firearms Act's taxation and registration requirements. This statute burdens core conduct covered by the Second Amendment, which protects "the right of the people to keep and bear Arms" both in the home[1] and in public.[2]

---

[1] *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) ("There seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms").

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111, 2122 (2022) ("[T]he Second and Fourteenth Amendments protect and individual's right to carry a handgun for self-defense outside the home.".)

In June of this year, the Supreme Court decided *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 211 (2022). The Court in *Bruen* overturned existing law in every circuit and held that the rights guaranteed by the Second Amendment are not subject to any interest balancing or means-ending scrutiny, explaining, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."[3] To then justify regulating protected conduct, "the government may not simply posit that the regulation promotes an important interest."[4] "Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition the delimits the outer bounds of the right to keep and bear arms."[5] The government cannot meet its burden with respect to 26 U.S.C. § 5861(d).

The National Firearms Act, 26 U.S.C. §5861(d), dates only to the early twentieth century. It was first enacted in 1934 and imposes stiff criminal penalties on anyone who receives or possesses a short-barreled rifle that is not registered in the National Firearms Registration and Transfer Records.[6] The first version of the statue was upheld as a valid exercise of Congress's authority to tax.[7] Despite purporting to regulate firearms associated with criminal activity,[8] the Act

---

[3] *Id*. at 2125-26.

[4] *Id*. at 2126.

[5] *Id*. at 2127.

[6] National Firearms Act of 1934, Pub L. No. 730474, 48 State. 1236-1240.

[7] *See Sonzinsky v. United States*, 300 U.S. 506, 514 (1937) ("since it operates as a tax, it is within the national taxing power").

[8] The National Firearms Act regulated arms "that had gained reputations as gangster weapons" and has been characterized as "a symbolic denunciation of firearms in the hands of criminals." Elliott Buckman, *Just a Soul Whose Intentions Are Good? The Relevance of A Defendant's Subjective Intent in Defining A "Destructive Device"*

covers arms that are in common use.[9] And the Act imposes these heightened restrictions and penalties on short-barreled rifles, even though they "have no discernable operational differences from firearms excluded from the Act," such as pistols and other handguns.[10]

26 U.S.C. §5861(d) is a twentieth century innovation that burden constitutionally protected conduct. Regulations did not exist during the founding era that taxed or registered short-barreled arms. And, as discussed further below, such regulations have no historical analogue. The government therefore cannot meet its burden to prove these regulations are consistent with the Nation's historical tradition of firearms regulation. The indictment must therefore be dismissed.

1. **The Indictment charges Mr. Rush with unlawful gun possession under a criminal statute which categorically burdens his rights under the Second Amendment.**

The indictment charges Mr. Rush with the possession was unlawful because the rifle had a short barrel and should have been registered under the National Firearm Act, but was not so registered. *Id*.

To determine whether a government regulation implicates the Second Amendment, *Bruen* asks whether "the Second Amendment's plain text covers an individual's conduct."[11] The answer to that question is not difficult in this case. The Second Amendment protects the right of the people

---

*Under the National Firearms Act,* 79 Fordham L. Rev. 563, 570-571 (2010) (quoting Franklin E. Zimring, *Firearms and Federal Law; The Gun Control Act of 1968*, 4 J. Legal Stud. 133, 143 (1975)).

[9] Over half-a-million short-barreled rifles are currently registered with the federal government. Bureau Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2021, at 16 (2021) (listing total short-barreled rifles registered at 532, 725 as of May 2021).

[10] James A. D'Cruz, *Half-Cocked" The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493, 496 (2017).

[11] *Bruen*, 142 S. Ct. at 2126

to "keep and bear arms." The conduct proscribed by 26 U.S.C. §5861(d), possession of a firearm, easily qualifies as "keep[ing]" and "bear[ing]" arms.[12] And 26 U.S.C. §5861(d) applies to everyone, necessarily impacting "the right of the people." Because the Second Amendment's plain text covers the conduct at issue in 26 U.S.C. §5861(d), the Constitution presumptively protects that conduct.

### 2. The *Bruen* framework centers Second Amendment analysis on the public understanding of the text at time of its adoption.

In *Heller*, the Supreme Court's landmark case establishing and individual right to keep arms, the Court remarked that nothing in its "opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."[13] The Eleventh Circuit, along with several others, took this statement to mean that the lower courts need not critically examine such prohibitions.[14] In *Rozier*, the Eleventh Circuit relied exclusively on Heller's language to hold that 18 U.S.C. § 922(g) is "a constitutional avenue to restrict the Second Amendment right of certain classes of people."[15] The *Rozier* decision contains no additional analysis, historical or otherwise. But other judges and scholars have noted that conspicuous lack of historical justifications for *Heller's* casual assertion that longstanding firearm regulations are presumed constitutional.[16]

---

[12] *See Heller*, 554 U.S. at 628-629 (holding statute that barred possession of handguns in the home unconstitutional.)

[13] *Heller*, 554 U.S. at 626

[14] *See, e.g., United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010)

[15] *Id.* at 771

[16] *See Kanter v. Barr*, 919 F.33 437, 453 (7th Cir. 2019) Barrett, J., dissenting) ("*Heller* did not undertake an exhaustive historical analysis" and "*Heller's* dictum does not settle the question before us"); *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015) (Manion, J., dissenting) (noting Heller's presumption "is very different thing from an assertion: we presume that laws are constitutional until and unless the regulation is

The Supreme Court's recent decision in *Bruen*, which abrogates *Rozier*, demands a fresh look at 18 U.S.C. § 922(g)(1) and the National Firearms Act through the lens of the Second Amendment's text, history, and tradition. The *Bruen* decision could not be clearer: "the government must **affirmatively prove** that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[17] It is no longer sufficient to rely on *Heller's* dictum to find a statute is presumptively constitutional, particularly give the recent vintage of the two statutes at issue here. The Court must carefully examine the challenged statues under *Bruen's* originalist framework.

Under that framework, the Second Amendment is "widely understood" to have codified a pre-existing right, the bounds of which are determined according to "*the public understanding* of [the text] in the period after its enactment or ratification."[18] Its adoption "is the very *product* of an interest balancing by the people" and "[i]t is this balance – struck by the traditions of the American people – that demands our unqualified deference."[19]

---

challenged and a competent court informs us otherwise"); Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 254 (2020) ("it would be unreasonable to read *Heller's* 'presumptively lawful' as 'conclusively lawful'")' Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. Rev. 375, 414 (2009) ("what is less clear, under the majority's reading of the [Second] Amendment, is why [felons and the mentally ill] should be" excluded from protection: Larson, *supra* n.10 at 1372 ("The Court offered no citations to support this statement and its ad hoc, patchy quality has been readily apparent to commentators, who have speculated that it was compromised language designed to secure Justice Kennedy's vote.").

[17] *Bruen*, 142 S. Ct. at 2127 (emphasis added).

[18] *Id.* at 2128.

[19] *Id.* at 2131.

That "unqualified deference" caused the Court to reject "the application of any 'judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statue's salutary effects upon other important government interests."[20] In doing so, the Court overturned all of the Court of Appeals, which had unanimously concluded that firearms regulations were subject to means-ends interest balancing.[21] But the government interests at stake are no longer relevant to the constitutional inquiry. "Instead, the government must affirmatively prove that its firearms regulation is party of the historical tradition that delimits the outer bounds of the right to keep and bear arms."[22]

While the *Bruen* decision does not purport to undertake a comprehensive historical analysis, it does set out several useful guideposts for courts to follow:

1. First, the relevant historical records it the founding era when the Second Amendment was adoption in 1791, and potentially when the Fourteenth Amendment incorporated the Bill of Rights with respect to the States in 1868.[23]

---

[20] *Id.* at 1229 (quoting *Heller*, 554 U.S. at 634).

[21] *Bruen*, 142 S. Ct. at 2126

[22] *Id.* at 2127

[23] *Id.* at 2136. *Bruen* acknowledged an ongoing scholarly debate on "whether courts should primarily rely on the prevailing understanding of individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope:"… but did not address the issue because the right "in both 1791 and 1868 was , for all relevant purposes, the same with respect to public carry." *Id.* at 2138. Whether the focus is on 1791 or 1868 likewise should not made a difference here because the oldest arguable analogues to 18 U.S.C. § 922(g) were not adopted until well into the twentieth century.

2. Second, the *Bruen* framework places the burden affirmatively on the government. The Court remarks, "we are not obligated to sift the historical material for evidence to sustain New York's statue [because that] is respondent's burden."[24]

3. Third, the Court instructed that the analysis should be "fairly straightforward" with respect to regulations that address general societal problems that have existed since the 18th century:

> For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations address the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional.[25]

4. Fourth, when presented with "unprecedented societal concerns or dramatic technological changes," courts must employ analogical reasoning.[26] In doing so, the court considers whether the modern regulation and its historical analogues "impose a comparable burden on the right of armed self-defense and whether that burden is comparable justified."[27]

5. Last, the Court cautions against defining the relevant unit of comparison too broadly.[28] Using "sensitive places" as an example, the Court was skeptical that historical laws regulating carriage of firearms in "sensitive places" could justify "New York to effectively

---

[24] *Bruen*, 142 S. Ct. at 2150.

[25] *Id.* at 2131.

[26] *Id.* at 2132.

[27] *Id.* at 2133.

[28] *Id.* at 2134.

the island of Manhattan a 'sensitive place.'"[29] Courts are not free to define historical categories as broadly as they see fit, rather courts must assess the historical record of sensitive places where weapons were prohibited and "can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible."[30]

Applying this framework, there is no basis in the Nation's history and tradition to uphold 18 U.S.C. § 922(g) or 26 U.S.C. § 5861(d).

### 3. There is no historical analogue for taxing and registering short-barreled weapons, nor for criminalizing failure to comply with taxation and registration requirements.

#### a. Short-barreled arms were common during the founding era and remain common today.

While regulation of short-barreled firearms is relatively new, dating only to the passage of the National Firearms Act in 1934, the existence of short-barreled weapons is not.[31] The Paget Carbine, with a barrel length of 16 inches, was introduced in the United Kingdom as early as 1800.[32] Various versions of the blunderbuss, firearms "boasting very short barrels, were popular

---

[29] *Id*. at 2134. ("[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of sensitive places far too broadly.")

[30] *Id*. at 2133.

[31] D'Cruz, *supra* n.15, at 508 ("Short-barreled firearms, unlike modern 'assault weapons,' *did* exist at the time of the Second Amendment's drafting and ratification.").

[32] Royal Armouries Collections, *Short Light Cavalry Carbine (Paget Carbine) (About 1800-1808)*, https://collections.royalarmouries.org/battle-of-waterloo/arms-and-armour/type/rac-narrative-569.html (last visited 8/11/2022); *see also* Royal Armouries Collections, *Flintlock muzzle-loading carbine – Short Light Cavalry Carbine (Experimental Paget Carbine) (About 1805)*, https://collections.royalarmouries.org/object/rac-object-567.html (last viewed 8/11/2022).

for self-defense and occasionally used by militaries."[33] The Royal Armouries collection contains several examples of blunderbusses with barrels under 15 inches.[34] The American Revolution Institute has an eighteenth-century blunderbuss in its collection, "a type that was carried by British troops during the American Revolution," with "a short, large-caliber barrel just shy of fifteen inches."[35] And in "1861, the Federal government purchased 10,000 Augustin carbines, a short rifle initially used by cavalry units, with a 14.5 inch barrel."[36]

Arms with short barrels are popular for traveling or for close-range conflict: "Because of their size and tactical maneuverability, short-barrel firearms are ideal for self-defense."[37] Short-barreled rifles remain popular today, despite being heavily regulated. Over half a million short-

---

[33] D'Cruz, *supra* n.15, at 503.

[34] Royal Armouries Collections, *Flintlock muzzle-loading blunderbuss – By Wheeler (about 1795)*, https://collections.royalarmouries.org/object/rac-object-30588.html (last visited 8/11/2022); Royal Armouries Collections, *Flintlock muzzle-loading blunderbuss – By J. Harding and Son (dated 1840)*, https://collections.royalarmouries.org/object/rac-object-15338.html (last visited 8/11/2022) (engraved "For Her Majesty's Mail Coaches"); Royal Armouries Collections, *Flintlock muzzle-loading blunderbuss – By James Barbar*, https://collections.royalarmouries.org/object/rac-object-15012.html (last visited 8/11/2022) (dated 1755).

[35] The American Revolution Institute, *Blunderbuss, the "Thunder Box" of the Battlefield*, https://www.americanrevolutioninstitute.org/recent-acquisitions/english-blunderbuss/ (last visited 8/11/2022).

[36] D'Cruz, *supra* n.15, at 503-04 (internal quotations omitted, quoting Frederick P. Todd, American Military Equipage 1851-1872, at 134-35 (1980)).

[37] D'Cruz, *supra* n.15, at 514. Most of the historical examples of short-barreled arms were used by cavalry or coaches. *See, supra* n.82, 84, 85. Today, short-barreled arms remain popular truck guns. *See,* John B. Snow, *The Ultimate Truck Gun Build (Plus 14 More Guns for Your Pickup),* Outdoor Life (June 5, 2020 5:30 P.M), https://www.outdoorlife.com/story/guns/the-ultimate-truck-gun-build/ (last viewed 8/11/2022) (recommending an AR pistol modified with an SB tactical brace as "compact and portable" and "an excellent truck gun").

barreled rifled are currently registered under the National Firearms Act.[38] AR-15 pistols equipped with a stabilizing brace, the unregulated, functional equivalent of short-barreled rifles, are even more popular. According to ATF, "manufacturers … have sold 3 million stabilizing braces since 2013."[39]

Under *Bruen* and *Heller*, "the Second Amendment protects the possession and use of weapons that are 'in common use.'"[40] By contrast, these cases conceded that the Second Amendment does not protect "dangerous and unusual weapons."[41] Rifles with short barrels are in common use, today and historically. They are no more dangerous or unusual that the handguns protected by *Bruen* and *Heller*, leading many to the inevitable conclusion that singling out short-barreled rifles for regulation is arbitrary.[42] There is no basis to exclude these arms from the protection of the Second Amendment.

---

[38] Bureau Alcohol, Tobacco, Firearms, and Explosives, Firearms Commerce in the United States: Annual Statistical Update 2021, at 16 (2021) (listing total short-barreled rifles registered at 532, 725 as of May 2021).

[39] Factoring Criteria for Firearms with Attached "Stabilizing Braces," 86 Fed. Reg. 30826, 30827-30828 (June 10, 2021). For an example of this type of firearm recommended as a truck gun, *see* Snow, *supra* n. 87.

[40] *Bruen*, 142 S. Ct. at 2128 (quoting *Heller,* 554 U.S. at 627).

[41] *Id.*

[42] *See* D'Cruz, *supra* n.15, at 536–37 ("The continued restriction of short-barrel firearms serves no purpose except to arbitrarily condemn citizens to grave penalties for what usually amounts to an honest mistake."); Stephen P. Halbrook, Firearms Law Deskbook § 8:10 (2021) (noting that in comparison to a short rifle, a handgun is a "far more concealable arm also with a barrel with a rifled bore"); Forrest Cooper, *SBR: The Arbitrary Infringement on a Short Barreled Rifle*, Recoil (August 20, 2021), https://www.recoilweb.com/sbr-the-arbitrary-infringement-on-a-short- barreled-rifle-169731.html (last visited 8/11/22) ("nothing better exemplifies" arbitrary restrictions "than the restrictions on owning a Short Barreled Rifle"); Press Release, U.S. Representative Tracey Mann, *Representative Tracey Mann Introduces the Home Defense and Competitive Shooting Act* (March 17, 2021), *available at*

### b. Discriminately regulating short-barreled rifles burdens rights protected by the Second Amendment and has no historical basis.

Even though the National Firearms Act does not outright ban short-barreled rifles, it imposes unconstitutional burdens on the people. The registration requirements, for example, can entail "wait times for several months to a year."[43] And the Supreme Court has made clear that the Constitution prohibits the government from imposing even de minimis burdens on fundamental rights.[44] As the Court observed in *Minneapolis Star*, the power to single out certain conduct for taxation "gives a government a powerful weapon against the taxpayer selected."[45] And Justice Kavanaugh, dissenting in *Heller II*, opined that the Supreme Court's prior cases "suggest[] that registration of all lawfully possessed guns is not permissible under the Second Amendment."[46] The *Bruen* case itself di not involve an outright ban, but a licensing scheme that required an application to demonstrate a special need for self-defense in order to carry handguns publicly.[47]

---

https://mann.house.gov/media/press-releases/representative-tracey- mann-introduces-home-defense-and-competitive-shooting (introducing legislation to remove short-barreled rifles from the National Firearms Act and regulate them "under the same restrictions as other semiautomatic rifles).

[43] D'Cruz, *supra* n.15, at 511 (citing NFA Tracker at https://www.nfatracker.com/nfa-transfer-time-tracking/ (last visited 8/11/22)).

[44] *See Crawford v. Marion C'nty. Election Bd.*, 553 U.S. 181, 191 (2008) ("However slight that burden may appear . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.) (internal quotations omitted); *Minneapolis Star & Trib. Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 592–93 (1983) (striking down "ink and paper tax" because a "tax that singles out the press, or that targets individual publications within the press, places a heavy burden on the State to justify its action").

[45] 460 U.S. at 585.

[46] *Heller v. District of Columbia,* 670 F.3d 1244, 1293 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

[47] 142 S. Ct. at 2122.

Like Other regulations that burden constitutional rights, therefore, the restrictions on owning short-barreled firearms must pass *Bruen's* historical test.

The burden is on the government to prove that the restrictions imposed by the National Firearms Act are historically based. It cannot do so. The purported problems posed by short-barreled firearms have existed since the 18th century, and therefore under *Bruen*, "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."[48] The inquiry is "fairly straightforward"[49] and the statute is unconstitutional.

### c. *United States v. Miller* Does not require a different result.

Shortly after the passage of the National Firearms Act, in 1939 the Supreme Court decided *United States v. Miller*, upholding the Act as constitutional as applied to short-barreled shotguns.[50] The case has been criticized on numerous grounds. The Court decided the case without hearing from the defendants, whose lawyer did not submit briefing or appear for oral argument.[51] The opinion itself is "quite terse," "consists primarily of lengthy quotations and string cites," and is "anchored by a few paragraphs of crabbed analysis."[52] Instead of examining the historical records, the Court relied on "the absence of any evidence" showing that short-barreled shotguns were useful defensive weapons, and claiming that such evidence was "not within judicial notice."[53] On this

---

[48] 142 S. Ct. at 1231.

[49] *Id.*

[50] 307 U.S. 174, 178 (1939).

[51] Brian L. Frye, *The Peculiar Story of United States v. Miller*, 3 N.Y.U. J. of L. & Liberty, 48, 66-67 (2008).

[52] *Id.*

[53] *Miller*, 307 U.S. at 178.

score, one writer concluded the opinion amounts to "ignorance, whether willful or innocent."[54] Perhaps because of these limitations, in *Heller*, the Supreme Court cautioned: "It is particularly wrongheaded to read *Miller* for more than what it said, because the case did even purport to be a thorough examination of the Second Amendment."[55]

So what, then, does *Miller* say about regulation of short-barreled rifles? In short, nothing. The facts of that case related only to short-barreled shotguns, which is a different type of weapon that is at issue here.[56] The Eleventh Circuit has "pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case.[57] And by its own terms, the case turned on the characteristics of short-barreled shotguns and "the absence of any evidence" tending to show they could contribute to the common defense.[58] A different type of weapon compels a new analysis, on conducted in accordance with the *Bruen* framework.

4. **Conclusion**

Under *Bruen*, the question for the Court is whether the government has "affirmatively prove[d] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Because the statues challenged here are not part of this Nation's history and tradition, they impost unconstitutional restrictions on the Second Amendment Right to keep and bear arms.

---

[54] D'Cruz, *supra* n.15, at 503; *see also* Section 5.a., describing the historical use of short-barreled arms.

[55] *Heller*, 554 U.S. at 621.

[56] *Miller,* 307 U.S. at 178; 28 U.S.C.§ 5845 (c) (defining "rifle" and § 5845(d) (defining shotgun).

[57] *Edwards v. Prime, Inc*., 602 F.3d 1276, 1298 (11th Cir. 2010).

[58] *Miller*, 307 U.S. at 178.

WHEREFORE, Mr. Rush respectfully requests that the Court dismiss the indictment; order him discharged from this case; and for such further relief as the Court may deem just and proper in the premises.

                Respectfully submitted,

                NEWTON BARTH, L.L.P.

By:   /s/ Talmage E. Newton IV
      Talmage E. Newton IV, ARDC6305302
      talmage@newtonbarth.com
      555 Washington Ave., Suite 420
      St. Louis, Missouri 63101
      (314) 272-4490 – Telephone
      (314) 762-6710 – Facsimile

*Attorney for Defendant*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that a true and accurate copy of the foregoing was served upon all counsel of record on this 26th day of September, 2022, via the Court's electronic filing system.

                /s/ Talmage E. Newton IV